## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| CONGREGATION ANSHEI  ROOSEVELT and CONGREGATION YESHIVAS ME'ON HATORAH, | : : : : | |
| Plaintiffs | : | Civ. No. 07-4109  (GEB) |
| v. | : : | **MEMORANDUM OPINION** |
| PLANNING AND ZONING BOARD OF THE BOROUGH OF ROOSEVELT, MAYOR AND COUNCIL OF THE BOROUGH OF ROOSEVELT, BOROUGH OF ROOSEVELT, ROOSEVELT PRESERVATION ASSOCIATION, LLC, JEFFREY ELLENTUCK, PEGGY MALKIN, STEVEN YEGER, JANE ROTHFUSS, ALLISON PETRILLA, and JAMES ALT, | : : : : : : : : : : | |
| Defendants. | : | |

**BROWN, C.J.**

This matter comes before the Court upon two motions to dismiss the complaint of

Congregation Anshei Roosevelt ("the Synagogue") and Congregation Yeshivas Me' On Hatorah

("the Yeshiva") (collectively "Plaintiffs").  One of these motions was filed by defendants

Borough of Roosevelt, the mayor of Roosevelt, the Council of the Borough of Roosevelt, the

Planning and Zoning Board of the Borough or Roosevelt, and Planning Board members Steven

Yeger, Jane Rothfuss, Allison Petrilla, and James Alt (collectively, "Defendants.") The other

motion to dismiss was filed by defendants Jeff Ellentuck and Peggy Malkin.  Plaintiffs have also

filed cross-motions for summary judgment.  On July 21, 2008, this Court heard oral argument.

For the reasons set forth below and on the record during oral argument, the Court will grant both

motions to dismiss.

**I.     BACKGROUND**

The Borough of Roosevelt ("Roosevelt"), originally known as Jersey Homesteads was founded in 1936, under the auspices of the Federal Government, as an agricultural and industrial cooperative community for Jewish farmers and garment workers.  (Compl. at ¶ 13.)  The establishment of the town was one of President Roosevelt's endeavors to combat the economic hardships of the great depression.  (*Id.* at ¶ 14.)  Roosevelt is designated on both the state and national registers for historic places.  The once predominantly Jewish town, remains the only municipality in the state and perhaps the country that has a synagogue as its only house of worship.  (*Id.* at ¶ 15.)  It was submitted at oral argument that the Borough is 1.95 square miles with a population of approximately 900 residents.

The property where the Synagogue is located is in the Borough's R-40, Residential District, located at 18 Homestead Lane in the Borough.  (Compl. at ¶ 16.)  Plaintiffs maintain that the building that houses Congregation Anshei Roosevelt was constructed in or around 1955.  (*Id.* at ¶ 17.)  At the time the synagogue was constructed, no zoning ordinances were in effect.  (Plaint. Opp. at 3.)  However, on May 23, 1979, the Borough adopted Ordinance No. 97, which allowed for public schools in the RA-40 Zone as a principal permitted use and allowed houses of worship as conditional uses.  (Compl. at ¶ 18.)  Pursuant to this ordinance, three conditions were required for a house of worship to be constructed in the RA-40 Zone: "(i) [a] two acre minimum lot size, (ii) a minimum parking standard, (iii) and maximum building coverage. (Compl. at ¶ 19.)  It was determined at a hearing before the Zoning Board that the synagogue lot size is 1.8757 acres (i.e. less than the two acre minimum) and that the synagogue does not meet the parking

2

requirements of the current zoning regulation.

In the face of declining membership and increasing difficulty in paying for rabbinical services, the leaders of the Synagogue congregation entered into a lease agreement with the Yeshiva,[1] whereby, in exchange for providing rabbinical services to the Congregation, the Yeshiva would be permitted to conduct religious and secular studies on the property.  (Compl. at ¶ 21).  One condition of the agreement between the synagogue and the Yeshiva was that no members of the Yeshiva would sit on the synagogue board.  According to Temple President Rabbi Elly Shapiro, this was done to allay the fear that if the Yeshiva grew in size, "there might be a lopsided lease or [] relationship."  (Van Grouw Afidavit, Exhibit C, 74-75.)

The first class of Yeshiva students began in September, 2005 with twelve students. (Compl. at ¶ 23.)  However, it was asserted by a neighbor of the Synagogue during one of the hearings before the Planning Board that the student population had grown to 34.  Rabbi Shapiro also testified during one of the hearings that there were six "junior rabbis or rabbis in training" living in a resident house on the premises.  (Van Grouw Afidavit, Exhibit C, 83-84.)

Plaintiffs allege that from the outset, certain residents vehemently opposed the Yeshiva operating at the Synagogue, stating that the Borough lacked the financial and physical resources to absorb the Yeshiva.  (Compl. at ¶ 25.)[2]  Plaintiffs further assert that the "virulence" expressed by those in opposition to the Synagogue/Yeshiva partnership, "divided the residents of the

---

[1] Plaintiff defines a yeshiva generally as "an institution whose primary focus is to facilitate and direct the study of Jewish religious texts and doctrine (referred to generally as 'Torah')."  (Compl. at ¶ 22.)

[2] Plaintiffs attach several news articles that evidence the tension caused by the agreement between the Congregation and the Yeshiva.  (*See* Van Grouw Affidavit, Exhibit E.)

Borough and ultimately led to then mayor Neil Marko (a supporter of the Yeshiva) being voted out of office in a recall election in 2006." (*Id.* at ¶¶ 26-27 )

Plaintiffs allege that in a letter to Robert Francis ("the zoning officer"), dated September 7, 2005, Bert Ellentuck, a neighbor of the Synagogue, complained that the Synagogue property was being used for improper purposes in violation of the Borough's local ordinance. (*Id.* at ¶ 29.)  According to Plaintiffs, Mr. Ellentuck complained that the operation of a private school was not permitted as a principal permitted use or a conditional use in the RA-40 Zone. (*Id.*)

In response, the zoning officer visited the synagogue to "determine the nature of the Yeshiva activity in the synagogue." (Plaint. Opp. at 5.)  Mr. Francis also sought and received the legal advice of the Borough's then-attorney, Ira Karasick. ("the Borough's attorney".) (Van Grouw Affidavit, exhibit D.)  In a written opinion, the Borough's attorney noted that private schools were indeed a prohibited use in the R-40 district. (*Id.* at 2.).  However, in his opinion, "the use of the property as a yeshiva for 12 students, without any modification of the existing facility, comports more with and is encompassed within the use of the property as a house of worship, rather than constituting the establishment of a private school." (*Id.* at 2.)  He based this opinion on what he described as "the education of youth as a traditional component of a house of worship in virtually all religions, certainly those prevalent in our society."  The Borough's attorney added that even if the Yeshiva was considered a private school, it would still be allowed to exist on the property because the New Jersey Municipal Land Use Law ("MLUL") requires that private schools be afforded the same treatment as public schools in a given area, and the R-40 zone allows public schools as a permitted use. (*Id.*)  Following the Borough's Attorney's advice, in a letter of October 3, 2005, the zoning officer declined to issue a summons for any

4

zoning violation.  (*Id.* at exhibit E.)

Plaintiffs allege that in the wake of the zoning officer's decision, Bert Ellentuck individually and through the Roosevelt Preservation Association ("the Association") sought to garner support in the community to oppose the Yeshiva.[3]  (Compl. at ¶ 33.)  Plaintiffs further allege that "at least two members of the Municipal Council are also members of the Association."  (Id. at ¶ 34).

This decision was appealed to the Zoning Board ("the Board") by the Association[4] and hearings took place before the Board on December 13, 2005, February 14, 2006, March 14, 2006, April 4, 2006, and September 12, 2006.  (Cohen Affidavit, Exhibit B, Resolution of the Board.)  At the September 12 hearing, Rabbi Zevulun Charlop was called by Plaintiffs to testify as an expert on Jewish law, custom, and practice.  Rabbi Charlop testified that "[a] yeshiva is a place where [students] congregate to study the Torah."  (Van Grouw Affidavit , exhibit C, 33.)  According to Rabbi Charlop, a synagogue "[m]ay not necessarily be a yeshiva[, b]ut a yeshiva is always a synagogue."  (*Id.* at 35; *see also* 57.)  He also testified that historically, a synagogue has always served the role of "a house of worship and [a] house of study."  (*Id.* at 35.)  Rabbi Charlop opined that the study of secular subjects at a Yeshiva, such as science or math, in his mind, would not change the nature of the Yeshiva.  According to Charlop, students would not

---

[3] Plaintiffs allege that "[a]lthough the association purports that its purpose is to ensure proper land use in the Borough, its focus has been on eliminating the Yeshiva and the Association's members have perpetuated an atmosphere of intolerance in the Borough towards Orthodox Jews."  (Compl. at ¶ 33.)

[4] Plaintiffs submit that following the zoning officer's decision not to issue a zoning violation, both he and the Borough's attorney were discharged from their positions and replaced. Plaintiffs also submit that the "Mayor of Roosevelt who had publicly spoken out in favor of the Yeshiva use was soon recalled from office."  (Plaint. Opp. at 5.)

attend a Yeshiva to study secular topics, but rather would attend a Yeshiva to engage in religious studies.  (*Id.* at 36-37.)  The rabbi opined further that a typical Yeshiva might consist of 80% religious studies and 20% secular studies.  (*Id.* at 53.)  According to Rabbi Charlop, a "yeshiva [as well as a synagogue] can operate all day and all night."  (*Id.* at 60; 67.)

At the March 14 hearing, Charles B. Rush, a licensed land surveyor was called upon by the Association to testify before the Planning Board.  (Van Grouw Affidavit, exhibit B.)  By Mr. Rush's calculations, the land where the synagogue is located is equal to 1.8757 acres, which is just under the two acre minimum mandated by the local ordinance.  (*Id.* at 24.)

John Chadwick, a licensed planner, was also called upon by the Association to testify at the March 14 hearing.  *Id.* at 37.  Mr. Chadwick testified that in the R-40 zone, the local zoning ordinance does not permit more than one  principal use on a piece of property.  *Id.* at 46.  Based upon the views expressed by the zoning officer and Mr. Chadwick's review of the lease, he opined that there were three principle uses on the subject property: (1) the synagogue, (2) the Yeshiva; and (3) the parsonage.  He also testified that the Synagogue (without regard to the Yeshiva) is a non-conforming use because the property is less than two acres and does not provide adequate parking pursuant to the relevant local ordinance.  *Id.* at 54.  As a result, Mr. Chadwick testified that the addition of a school to the synagogue would alter that nonconforming use, regardless of whether the added use was a permitted use.  *Id.* at 100.  In Mr. Chadwick's opinion, from a "planning standpoint," worship and religious instruction are two separate uses. *Id.* at 58.  Mr. Chadwick distinguished a synagogue or church that might have classes on Sundays or after school (a permitted use) from the situation at issue here where the Yeshiva is running classes during the day in the same building where worship is taking place at other times.  *Id.* at

58-59.  Mr. Chadwick added that it was clear to him from the description given by the zoning

officer in addition to the lease between the synagogue and the Yeshiva, that the Synagogue is

being utilized for two different uses at different times.  *Id.* at 60.  He also noted that the zoning

officer's letter failed to mention that the lease provided for the Yeshiva to add dormitories to the

property.  *Id.* at 61-62.  Mr. Chadwick concluded that the Yeshiva's presence on the property was

a non-conforming use and the Yeshiva was obligated to apply for a variance to maintain this use.

*Id.* at 54.

The Board also heard from Bert Ellentuck, a member of the Association and neighbor of

the Synagogue, at the hearing of September 12, 2006.  Mr. Ellentuck testified that it was his

"belief that there is no Congregation Anshei Roosevelt," and opined further that the Yeshiva had

taken over the building and was not respecting the local zoning ordinances.  (Van Grouw

Affidavit, Exhibit C, 93.)  Mr. Ellentuck testified further that he was told by someone that

morning that there were 34 students currently enrolled in the Yeshiva who were living in various

buildings around the community.[5]  According to Ellentuck, these students were "in school and on

the street from about 7:30 in the morning to sometimes 12 or one o'clock [at] night."  *Id.* at 93-

94.  He also indicated that the lights in the synagogue are frequently on and there are also a

number of cars always parked on the side of the street.  *Id.* at 94.

Another resident living on the same street as the Synagogue, Melissa Brankle, expressed

dissatisfaction over the Yeshiva's involvement at the Synagogue, due to the loss of her quiet

enjoyment of her property since the Yeshiva has commenced its operations at the Synagogue.

---

[5] Mr. Ellentuck's voice appears to have been inaudible on the tape of the hearing, as
indicated in the transcript, and as such, the transcript does not reflect who told Mr. Ellentuck
about the current population of the Yeshiva.

Ms. Brankle testified that vehicles travel to and from the synagogue 40 to 50 times a day beginning at 7:20 a.m. and ending around 1:30 a.m. the next day.  She added that 20 to 30 students are outside playing at all hours of the day, including the evenings, seven days a week. *Id.* at 100.

Mr. Ellentuck's wife, Mrs. Shan Ellentuck also testified that she was concerned about a provision in the lease agreement that provided for a 25 year extension of the lease between the Synagogue and the Yeshiva.  According to Mrs. Ellentuck, the Yeshiva has stated that it intends to significantly increase the student population.  Mrs. Ellentuck testified that estimates on the part of the Yeshiva as to the potential future population range from 50 to 300 students.  *Id.* at 101-02.

On July 24, 2007, the Board adopted a Resolution, overturning the zoning officer's decision.  (*See* Cohen Affidavit, Exhibit B.)  In the Resolution, the Board noted all the testimony highlighted above, and also the complaints of several other community members, regarding the potential harm the Yeshiva's presence could cause to the town's water and sewer systems.  (*Id.*)  The Board found that the synagogue was established in 1955, before the minimum 2 acre requirement was established as reflected in the current zoning ordinance.  (*Id.* at ¶ 35.)  The Board also accepted the evidence produced by the Association that the Synagogue as a house of worship, "is a nonconforming use in that it does not comply with the conditional use standards contained in the Ordinance."  (*Id.*)  The Resolution further stated that "[w]hile the Board accepts the testimony of the Rabbi that a Yeshiva can be a synagogue, the Rabbi acknowledged that the Yeshiva is a school."  (*Id.* at ¶ 36.)  The Board continued that "[t]he argument that the Yeshiva is a function of a Jewish house of worship may be accurate.  The problem is that from a land use

8

perspective, the Yeshiva has resulted in a significant increase in the intensity of the use." (*Id.* at ¶ 37.) Because the Board found the Yeshiva to be "an expansion of an already nonconforming use," it concluded that a variance was required for its continued operation. (*Id.*) The Resolution continued that "[s]ince Roosevelt has other locations within the plan available for such an intense use, the expansion of the nonconforming use is not justified." (*Id.*) The Board further found that while "a house of worship might have religious classes in appropriate circumstances, in this instance, the students are outside late at night when they are not in classes." The Board concluded that these activities did not constitute a religious exercise. (*Id.* at ¶ 38.)

The Board also apparently accepted Mr. Ellentuck's testimony that there were 12 students at the inception of the Yeshiva, as compared to the Yeshiva's current student population of 34. The potential future growth in student population at the Yeshiva led the Board to conclude that municipal overview of this process was necessary for public health and safety reasons, and to preserve the integrity of the zone plan. (*Id.* at ¶ 39.)

The Board further noted that at the time the zoning officer rendered his opinion, he relied on the Borough's Attorney, and neither the zoning officer nor the Borough's Attorney were aware of the Yeshiva's plans to become a boarding school. (*Id.* ¶ 40.) The Board added that in rendering its opinion, the Borough Attorney relied on the Municipal Land Use Law ("MLUL") which prohibits discrimination against between public and private schools. However, because it concluded that the Yeshiva is a boarding school, and houses six junior rabbis in the parsonage house, with additional students living in a house at another property (known as the "Brottman

9

property"),[6] the Board found that the Yeshiva was not protected by the MLUL (*Id.* at 40-42.)

The Board concluded the following:

> The Yeshiva and the Congregation have the right and the responsibility to apply to the Board for variances from the conditional use standards and conditional use and site plan approval.  The filing of an application does not constitute a substantial burden but is a burden shared by all landowners under the land use regulatory scheme that exists in New Jersey.

> Nothing in the Board's decision on this appeal should be interpreted as being opposed to the establishment of the Yeshiva on the Property.  The sole decision rendered is that land use approval is required and the Zoning Officer erred in allowing the Yeshiva to be established without such approvals.  This is not a question of prohibition or substantial burden but whether the synagogue and the yeshiva are allowed to exist without municipal oversight.

> The Board concludes that the Zoning Officer erred in that the proposal is a significant intensification of the non-conforming use and should have been allowed as of right without any municipal review or approval.

(*Id.* at ¶¶ 43-45.)

Plaintiffs allege that while the appeal was pending before the Board, the Borough Council engaged in two attempts to prevent the Yeshiva from operating at the synagogue.  (Plaint. Opp. at 8.)  According to Plaintiffs, in mid to late  2006, the Council attempted to pass Ordinance No. 97-36, which provided in part that "[a] house of worship existing before the date of this zoning ordinance and located in a residential district shall . . . . [b]e located on a lot of at least two acres."  (Compl. at ¶ 48.)  Plaintiffs further maintain that the proposed ordinance "re-defined the principal permitted uses and conditional uses within the District R-40 . . . deleting 'public

---

[6] The Resolution stated that the legality of the use of the house at the Brottman property was the subject of a separate appeal before the Board.

schools' from the list of principal permitted uses, and deleting 'houses of worship' from the list

of conditional uses." (*Id.* at ¶ 49.) Plaintiffs assert that had this proposed ordinance been

enacted, it would have violated New Jersey Municipal Land Use Laws that protect pre-existing

non-conforming uses. (*Id.* at ¶ 50.) According to Plaintiffs, a newer version of Ordinance No.

97-36 was enacted, which no longer imposed limitations on existing uses. Plaintiffs assert that

the enacted ordinance also provides for schools and dormitories in the Borough, but restricts

them to a remote area knows as the RA-400 zone, where physical restraints make development

highly unlikely. (*Id.* at ¶ 51; *see also* Cohen Affidavit, Exhibits C, D.)

Plaintiffs appeal the Board's Resolution to this Court. In Count One, Plaintiffs assert that

the Board's determination is "arbitrary, capricious and against the weight of evidence" and that

the the New jersey Municipal Land Use Law requires that the Yeshiva be treated in the same

manner as public schools. (*Id.* at ¶ 60.) Count Two alleges that Ordinance No. 97 is

unconstitutional as applied.[7] Count Three alleges violations of the Religious Land Use and

Institutionalized Persons Act ("RLUIPA"). Count Four alleges that the Board's decision in

addition to the actions of all defendants violates Plaintiffs' rights to freely exercise their religion

under the First and Fourteenth Amendment. Count Four also alleges Equal Protection and Due

Process violations. Count Five alleges violates of New Jersey's Constitution. Finally, Count Six

alleges violations of the New Jersey Law Against Discrimination.

## II.  DISCUSSION

### A.  Legal Standard

---

[7] The complaint does not specify whether Count Two alleges federal or state constitutional violations. However, Plaintiffs's counsel maintained at oral argument that Counts Three and Four of the complaint were Plaintiffs' only federal constitutional claims.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that the plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007) (*citing Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint will survive a motion under Rule 12(b)(6) if it states plausible grounds for plaintiff's entitlement to the relief sought. *Id.* at 1965-66 (*abrogating Conley's* standard that the "complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). In other words, it must contain sufficient factual allegations to raise a right to relief above the speculative level. Id. at 1965. The issue before the Court "is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims." *Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon those documents. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993), cert. denied 510 U.S. 1042 (U.S. Jan. 10, 1994).

**B. Dismissal of Plaintiffs' Claims Against Ellentuck and Malkin's Claim**

Noerr-Pennington Doctrine

Defendants Ellentuck and Malkin argue that the *Noerr-Pennington* doctrine bars

Plaintiffs' claims against them.  (Ellentuck and Malkin Br. at 6.)  The Court agrees.

The *Noer-Pennington* doctrine was established in the seminal cases of *Eastern Railroad Presidents Conference v. Noerr Motor Freight*, Inc., 365 U.S. 127 (1961) ("Noerr"), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S. Ct. 1585, (1965) ("Pennington"), where the Supreme Court held "that an individual is immune from liability for exercising his or her First Amendment right to petition the government."  *Barnes Found. v. Township of Lower Merion*, 242 F.3d 151, 159 (3d Cir. Pa. 2001).  These cases took place in an antitrust context.  *Id.*  The defendants were alleged to have violated the Sherman Act by acting together and campaigning to persuade the government to eliminate competition within their particular industries.  *Id.*  The Supreme Court however found that the Sherman Act did not prohibit the defendants' campaign.  *Id.*  The Court held that the defendants were immune without regard to their motives in initiating the campaigns, explaining that individuals' rights to petition the government "cannot properly be made to depend on their intent in doing so."  *Noerr*, 365 U.S. at 139.

The Supreme Court as well as the Third Circuit Court of Appeals have since extended the *Noerr-Penington* doctrine beyond the scope of antitrust to areas such as civil conspiracy and cases arising under § 1983 as well as other civil rights statutes.  *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)(NAACP participants immune to civil conspiracy claim under *Noerr-Pennington* with regard to non-violent aspects of boycott against white owned businesses, which was designed to force elected officials to comply with demands for integration and racial equality); *Brownsville Golden Age Nursing Home*, *Inc. v. Wells*, 839 F.2d 155 (3d Cir. 1988)(in a civil conspiracy suit, private citizens, dismayed at the conditions of a nursing home, immune from damages based on their attempts to persuade public official to decertify the nursing

home)*; (Pfizer Inc. v. Giles* (*In re Asbestos School Litigation*), 46 F.3d 1284 (3d Cir .

1994)(defendant immune from liability for involvement and financial support of lobbying

organization without specific evidence of wrongful conduct).  The *Noerr-Pennington* doctrine

has also been applied to New Jersey state tort law claims as well.  *See Cheminor Drugs, Ltd. v.

Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. N.J. 1999).

Defendants Malkin and Ellentuck dispute that they were public officials at the time of

their challenged conduct.  However, even if they were, *Noerr-Pennington* immunity still applies.

In *Mariana v. Fisher*, the Third Circuit, *quoting Manistee Town Ctr. v. City of Glendale*, 227

F.3d 1090 (9th Cir. Ariz. 2000), explained that "'[g]overnment officials are frequently called

upon to be ombudsmen for their constituents' whereby 'they intercede, lobby, and generate

publicity to advance their constituents' goals.'"  338 F.3d 189, 200 (3d Cir. Pa. 2003).  The Court

added, again quoting *Manistee,* that the immunity provided to private officials by the

*Noerr-Pennington doctrine* was "'nearly as vital'" to democracy as the protection that it provides

to private citizens."  *Id.*

In *Barnes Foundation. v. Township of Lower Merion*, the Third Circuit applied the

*Noerr-Pennington* doctrine in a similar scenario to this case, providing immunity to residents

who opposed and spoke out against the Barnes Foundation's (the "Foundation") plan to re-open

their art gallery in their neighborhood on a larger scale than had previously existed.  242 F.3d at

159.  The Foundation alleged that these neighbor-defendants organized a Neighborhood

Association, to oppose the re-opening of the gallery and challenge other Foundation activities

that the neighbors believed were in violation of the Foundation's agreement, under which it was

established and in violation of local zoning rules.  *Id.* at 154.  The Foundation asserted that the

Association also supported litigation that would limit the expansion of the gallery. *Id.* The Foundation's complaint alleged that the neighbors sought to deprive it of its constitutional rights on the basis of race (three of the four Foundation trustees were African American) in violation the Due Process and Equal Protection Clauses of the United States Constitution. *Id.* at 154-55, 156.

The District Court in *Barnes* dismissed the Foundation's claims against the neighbors finding that the neighbors were protected by First Amendment immunity i.e. – the *Noerr-Pennington Doctrine. Id.* at 158. The Foundation did not appeal this decision. *Id.* However, the neighbors did appeal the District Court's denial of their motion for attorney's fees. Before addressing the issue of attorney's fees, the Third Circuit noted that "[u]nquestionably, given the outstanding case law at the time," the district court properly dismissed the complaint against the neighborhood defendants. *Id.* However because neither the Third Circuit nor the Supreme Court had previously "held expressly that the *Noerr-Pennington* doctrine provides an immunity for First Amendment activity allegedly constituting a civil rights abuse," the Court found that the Plaintiffs' actions in filing suit against the neighbors fell just short of constituting the type of frivolousness required for an award of attorney's fees. *Id.* at 158, 162. However, the Court gave the following warning to those who might attempt to similarly deprive others of their First Amendment rights in the future:

> Before we close our discussion of the Noerr-Pennington doctrine we hasten to add that persons contemplating bringing suits to stifle First Amendment activity should draw no comfort from this opinion because the uncertainty of the availability of a First Amendment defense when a plaintiff brings a civil rights case now has been dispelled. This point is of particular importance in land-use cases in which a developer seeks to eliminate community opposition to its plans as this opinion should make it clear that it will do so at its own peril.

15

*Id.* at 162.

The complaint accuses Ellentuck and Malkin of engaging in the type of activity that is protected by *Barnes* – specifically that through their involvement in the Association, they influenced the Planning Board's decision with regard to the Congregation and the Yeshiva (comp1. at ¶ 45.) and expressed critical views about the Congregation and the Yeshiva as being "too orthodox." (compl. at ¶ 73.)  Similar to the plaintiffs in *Barnes*, Plaintiffs here: (1) seek land use approval; (2) were opposed by citizens who spoke out against them (Ellentuck and Malkin); (3) and filed a civil rights suit against these citizens.  As *Barnes* makes clear, Plaintiffs' claims against Ellentuck and Malkin fall squarely within the protections of the *Noerr-Pennington* Doctrine.

Legislative Immunity

To the extent that Plaintiffs seek damages against Ellentuck and Malkin because of their role in passing Ordinance No. 97-36, these claims are barred by the doctrine of absolute legislative immunity.  "Members of local legislative bodies, such as municipal planning boards, are entitled to absolute legislative immunity for actions taken in a purely legislative capacity." *County Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159, 172 (3d Cir. 2006) (*citing Acierno v. Cloutier*, 40 F.3d 597, 610 & 610 n.10 (3d Cir. 1994) (en banc)).  The Third Circuit has set out a two-part test to determine whether an action is "legislative" for purposes of determining immunity: "(1) the action must be 'substantively' legislative, which requires that it involve a policy-making or line-drawing decision; and (2) the action must be 'procedurally' legislative, which requires that it be undertaken through established legislative procedures." *Acierno*, 40 F.3d at 610 (citation omitted).

16

In the present case, both prongs are met.  "[W]hen zoning officials are enacting or amending zoning legislation, their acts are substantively legislative."  *County Concrete Corp*, 442 F.3d at 172.  Such was the case here in the enaction of Ordinance No. 97-36.  With regard to the second prong, an ordinance is "procedurally legislative if it was undertaken through established legislative procedures." *Acierno*, 40 F.3d at 613.  Public records establish that such procedures were followed here and Plaintiffs do not contend otherwise.  As such, Ellentuck and Malkin are also protected for any claim stemming from their role in enacting Ordinance No. 97-36 by the doctrine of absolute legislative immunity.

### C.  Ripeness

Defendants argue that because Plaintiffs have never filed a variance application or received a final determination with respect to the Yeshiva operating at the Synagogue, Plaintiffs' complaint is not ripe for review.  (RPA Br. at 15 [docket # 23]; Borough Br. at 9 [docket # 9].)  Defendants assert that the only ruling issued by the Board in the Resolution was that a variance is required for the Yeshiva to operate at the Synagogue.  (Borough Br. at 12; RPA Br. at 15.)  This ruling, according to Defendants, does not represent a final determination pursuant to RLUIPA or otherwise, is not a substantial burden, and does not limit the manner in which Plaintiffs can use the property because Plaintiffs may still seek a variance to operate the Yeshiva at the Synagogue.  (*Id.*)  As such, Defendants argue that Plaintiffs must first follow the land use procedures in place to seek a variance, before this Court may properly hear their case.

Plaintiffs do not dispute that a final determination by the Board is a prerequisite for this Court to consider their claims.  However, Plaintiffs maintain that the Board rendered such a final determination when it stated in the Resolution that the Yeshiva's operations at the Synagogue

were a violation of local zoning controls.  (Plaint. Opp. at 10 [docket # 17].)   Plaintiffs further

assert that because the Objectors (and not Plaintiffs) appealed the zoning officer's decision (in

favor of Plaintiffs) to the Board, "[t]here was no reason or legal basis for the Yeshiva to file an

appeal or a variance application to the Board."  (*Id.* at 12.)  Plaintiffs maintain that "[t]he Board's

after-the-fact invitation to the Yeshiva to file for a variance" does not effect the finality of the

Board's interpretation of a local ordinance in the Resolution.  (*Id.*)  Plaintiffs further assert that

Defendants desire Plaintiffs to seek a variance because the standards by which a variance for a

non-permitted use are granted are very burdensome for an applicant, and the standard of review

on appeal is very deferential to the Board.  (*Id.* at 13-14.)  Plaintiffs also seem to argue that if

they were forced to file a variance application, they would later be barred from appealing the

board's decision under New Jersey Court Rule 4:69-6(a), which sets a 45 day limit for parties to

appeal a decision of a planning board.  (*Id.* at 15.)

  "Ripeness is a doctrine rooted in both Article III's case or controversy requirement and

prudential limitations on the exercise of judicial authority."  *Murphy v. New Milford Zoning*

*Comm'n*, 402 F.3d 342, 347 (2d Cir. Conn. 2005)(*citing Suitum v. Tahoe Reg'l Planning Agency*,

520 U.S. 725, 732 (U.S. 1997)).  "The purpose of the ripeness doctrine is to 'prevent the courts,

through avoidance of premature adjudication, from entangling themselves in abstract

disagreements over administrative policies, and also to protect the agencies from judicial

interference until an administrative decision has been formalized and its effects felt in a concrete

way by the challenging parties.'"  *Wyatt v. Gov't of the V.I.*, 385 F.3d 801, 806 (3d Cir. V.I.

2004)(*quoting Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49, (1967), *overruled on*

*other grounds*, *Califano v. Sanders*, 430 U.S. 99, 105 (1977)).  In determining whether a matter

18

is ripe, courts make a twofold inquiry to determine both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Brubaker v. E. Hempfield Twp.*, 234 Fed. Appx. 32, 34-35 (3d Cir. Pa. 2007)(*quoting Abbott Labs.*, 387 U.S. at 149). "A dispute is not ripe for judicial determination 'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Wyatt*, 385 F.3d at 806 *(quoting Doe v. County of Centre, PA*, 242 F.3d 437, 453 (3d Cir. 2001)(*citation omitted*)).

"[I]n cases involving land-use decisions, a property owner does not have a ripe constitutional claim until the zoning authorities have had 'an opportunity to arrive [] at a final, definitive position regarding how [they] will apply the regulations at issue to the particular land in question.'" *Sameric Corp. of DE v. City of Philadelphia*, 142 F.3d 582, 597 (3d Cir. 1998)(*quoting Taylor Inv., Ltd. v. Upper Darby Township*, 983 F.2d 1285, 1290 (3d Cir. 1993)); *see also Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (U.S. 1985)). This requirement, known as the finality rule, requires a property owner to demonstrate that a "'final decision has been reached by the [local] agency before it may seek compensatory or injunctive relief in federal court on federal constitutional grounds.'" *Acierno v. Mitchell*, 6 F.3d 970, 974 (3d Cir. Del. 1993)(*quoting Hoehne v. County of San Benito*, 870 F.2d 529, 532 (9th Cir. Cal. 1989)). Four considerations buttress this requirement: (1) "a final decision from a local land use authority aids in the development of a full record;" (2) exhaustion of the variance process enables courts to know the exact manner that "a regulation will be applied to a particular parcel;" (3) "a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes. Thus, requiring a meaningful variance application as a prerequisite to federal litigation enforces the long-standing principle that disputes

19

should be decided on non-constitutional grounds whenever possible;" and (4) allowing a zoning authority to issue a final determination enforces principles of federalism and "evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution." *Murphy*, 402 F.3d at 348.

The Court in *Williamson* originally applied the finality rule in the context of a Just Compensation Takings Claim, but since then the Third Circuit has applied the same requirement to as-applied substantive due process and as-applied equal protection claims. *County Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159, 164 (3d Cir. N.J. 2006). The finality rule can bar these as-applied claims because "[o]nly once a '[local] decision maker has arrived at a definitive position on the issue' has a property owner been inflicted with 'an actual, concrete injury.'" *Id.* (quoting *Williamson*, 473 U.S. at 192). "The Third Circuit has stressed the importance of the finality rule in the as-applied context because of its 'reluctance to allow the courts to become super land-use boards of appeals. Land-use decisions concern a variety of interests and persons, and local authorities are in a better position than the courts to assess the burdens and benefits of those varying interests.'" *Cornell Cos. v. Borough of New Morgan*, 512 F. Supp. 2d 238, 256 (E.D. Pa. 2007)(quoting *Sameric*, 142 F.3d at 598).

Notwithstanding the strong policy considerations favoring the finality rule, "the finality requirement is not mechanically applied." *Murphy*, 402 F.3d at 348. "A property owner [may] be excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile." *Id.; see also Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014* n. 3 (U.S. 1992)(finality requirement not mandatory when applying for a permit would be "pointless" because council for local municipality stipulated that no permit would be issued even

if an application was made).   In addition "a property owner need not pursue such applications

when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear

that all such applications will be denied." *Murphy*, 402 F.3d at 348  (*citing Southview Assoc.,

Ltd. v. Bongartz*, 980 F.2d 84, 98-99 (2d Cir. 1992)).

      During oral argument, this Court expressed concern over what, on the surface, appeared

to be somewhat contradictory language in the Board's Resolution.  The Resolution states that

"[n]othing in the Board's decision on this appeal should be interpreted as being opposed to the

establishment of the Yeshiva on the Property.  The sole decision rendered is that land use

approval is required and the Zoning Officer erred in allowing the Yeshiva to be established

without such approvals."  (Cohen Affidavit, Exhibit B, ¶ 44.)  However, the Resolution also

states that because there are "other locations within the [Borough] available for such an intense

use, the expansion of the nonconforming use is not justified."  (*Id.* at ¶ 37.)    These two sections

of the Resolution appeared to be in discord, with the latter statement seeming to oppose the

establishment of the Yeshiva at the Synagogue – something the Board was denying it was doing

in the former quoted section of the Resolution.  This apparent contradiction raised the question of

whether requiring Plaintiffs to go through the variance process would be an exercise in futility –

if in fact the Board had already determined that it would not permit the Yeshiva to operate at the

Synagogue.  At oral argument, Defense counsel explained that the Resolution's statement that

"the expansion of the nonconforming use is not justified" simply meant that the Yeshiva's

operations at the Synagogue were not justified *in absence of a variance*.  Counsel urged that this

explanation was clear when looked at in the overall context of the Resolution.  Counsel for the

Plaintiffs did not contest Defense counsel's explanation, and the Court finds it to be convincing.

Indeed, Plaintiffs' counsel did not argue that the futility exception should be applied, either in their papers or at oral argument.  Given that Defendants have repeatedly insisted – in the Resolution, in their motion papers, and at oral argument, that the Planning Board will not discriminate against the Plaintiffs in any way, if Plaintiffs choose to seek a variance, the narrow futility exception to the ripeness requirements is not applicable.  *See Murphy*, 402 F.3d at 348; *Lucas*, 505 U.S. at  1014, n. 3.

The question is whether the Resolution constitutes "a final, definitive position as to how [the Board] will apply the regulations at issue to the particular land in question," which would make Plaintiffs' federal claims ripe for review.  *Williamson*, 473 U.S. at 191.  Plaintiffs cite *Taylor Inv., Ltd. v. Upper Darby* and *Murphy v. New Milford Zoning Comm'n* as providing support for the proposition that after the zoning officer's decision was appealed to the Board, hearings were held, and the Board issued a Resolution, no more administrative procedures were required, and as such, Plaintiffs' claims before this Court are ripe.  (Plaint. Br. at 11.)  The Court interprets *Taylor* and *Murphy* differently.

In *Taylor*, after a zoning officer revoked the plaintiff's use permit for his club, the plaintiff filed a 42 U.S.C. § 1983 claim in the District Court for the Eastern District of Pennsylvania.  983 F.2d at 1289.  Because the plaintiff  "did not reapply for a use permit, appeal the revocation to the Township Zoning Board, or seek a variance or special exception to the Township's zoning ordinances," the Third Circuit, applying the finality rule, affirmed the District Court's dismissal of the plaintiff's claim on ripeness grounds.  *Id.* at 1289, 1292.  Plaintiffs assert that by using the word "or" in the preceding sentence, the *Taylor* Court ruled that the plaintiff could have satisfied the finality rule in obtaining a variance or appealing the Board's decision,

22

but that as long as Plaintiff had followed through with either available remedy, the finality rule would be satisfied.  Because in the present case the zoning officer's decision was appealed to the board, which held a full hearing, Plaintiffs maintain that they abided by the procedural requirements of *Taylor*, and their claim is therefore ripe.  The Court disagrees.

The court in *Taylor* stated that if the plaintiff had taken the extra step to appeal the zoning officer's decision to the zoning board, "the board *could* have" overturned the zoning officer's decision.  *Id.* at 1293 (emphasis added).  However, the court did not state that appealing to the board *would* have emphatically provided the plaintiff with a final determination, for the purpose of determining the ripeness of the plaintiff's claims.  As such, this Court cannot conclude from *Taylor* that Plaintiffs' federal claims in this matter are ripe simply by virtue of the fact that the zoning officer's decision was appealed to the board.

In *Murphy*, after the plaintiffs were issued a cease and desist order for holding religious services in their home, they filed suit in federal court.  402 F.3d at 345.  The Second Circuit found the plaintiffs' federal claims to be unripe, because the plaintiffs failed to appeal the cease and desist order or receive a final determination from a local authority as to how their property could be used.  *Id.* at 352.  The First Circuit noted that "[h]ad the Murphys appealed the cease and desist order to the Zoning Board of Appeals and requested variance relief from that body . . . things *may* very well have been different."  *Id.*  (emphasis added).  However, the court did not state that an appeal of the cease and desist order definitely would have made Plaintiffs' federal claims ripe for review – rather that in absence of an appeal, Plaintiffs' claims were certainly unripe.  The Court recognizes that in participating in the local public hearings, Plaintiffs here have participated in a more extensive administrative process than the plaintiffs in *Taylor* and

23

*Murhpy*.  However, neither *Taylor* nor *Murphy* nor stand for the proposition that Plaintiffs

suggest – that in rendering a decision (regardless of the import of the decision), the

administrative process came to a close, making Plaintiffs' federal complaints ripe.

　The ultimate question before the Court in determining whether Plaintiffs' federal claims

are ripe, is whether the Board's Resolution constitutes "a final, definitive position as to how [the

Board] will apply the regulations at issue to the particular land in question."  *Williamson,* 473

U.S. at 191.  Despite the administrative proceedings that have taken place, and the Board's ruling

requiring Plaintiffs to seek a variance, the Court concludes that the local municipality should be

given an opportunity to reach to a final decision as to how it will apply the local regulation to the

property at issue.  Specifically, the Board should be permitted to rule on whether the Yeshiva

may operate on the Synagogue premises in the matter Plaintiffs desire, and if not, whether the

Yeshiva will be barred completely from operating at the Synagogue, or whether it may operate to

some lesser degree.  The Court notes Plaintiffs' counsel's position during oral argument – that in

requiring Plaintiffs to apply for a variance, the Board has essentially come to the determination

that Plaintiffs are acting in violation of the zoning regulations.  However, local zoning boards

"are flexible institutions . . . that may "'give back with one hand what they have taken with the

other.'" *Taylor*, 983 F.2d at 1294 (*quoting  Macdonald v. County of Yolo*, 477 U.S. 340, 350

(1986)).

　Allowing the Board to consider and rule on Plaintiffs' variance application will help

develop a full record – something that is absent at this time, and as such, militates against review

of Plaintiffs' federal claims.  *See Murphy*, 402 F.3d at 348.  Issues such as the exact population of

the Yeshiva, the degree to which the Yeshiva's presence increases traffic, whether and how much

time students will be spending outside on the street, and the Yeshiva's plans for growth in the future are all issues that have not been fully fleshed out in the record before the Court – and should be for Plaintiffs' federal claims to be ripe.  Exhausting the variance process will also determine exactly how the Board will apply the regulations to the property.  *Id.*  Such a determination is critical in order to define the constitutional injury.[8]  *Taylor*, 983 F.2d 12 at 1291.  Of course, the very real possibility exists that the Board will grant Plaintiffs' variance application, permitting the Yeshiva to operate on the property, obviating the need for Plaintiffs to file suit, and preventing this Court from becoming prematurely "entangl[ed] in a constitutional dispute[]."  *Murphy*, 402 F.3d at 348.  Finally, the Court again notes that "local bodies are better able than federal courts" to handle this type of dispute.  *Taylor*, 983 F.2d at 1291 (quotation omitted).  In absence of a final determination on Plaintiffs' application, this Court will not act as a "super land-use board[] of appeals."  *Sameric*, 142 F.3d at 598.

In reaching this decision, the Court emphasizes that it is only addressing Plaintiffs' federal claims.  Because the Court finds Plaintiffs' federal claims to be unripe, it declines to retain jurisdiction over Plaintiffs' pendent state law claims.  *See* 28 USCS § 1367(c)(3); *Fralin v. County of Bucks*, 296 F. Supp. 2d 609, 616 (E.D. Pa. 2003).

## III.  CONCLUSION

For the reasons set forth in this Memorandum Opinion and on the record during oral argument on July 21, 2008, Defendants' motions to dismiss are granted.  Plaintiffs' motion for

---

[8] During oral argument, Plaintiffs' counsel identified the present injury to Plaintiffs as merely being required to seek a variance.  Plaintiff has provided no authority (nor is the Court aware of any) to support this type of injury satisfying Federal Constitutional ripeness standards. The Court also notes that the Yeshiva is still operating at the Synagogue.

summary judgment is denied.  An appropriate form of order accompanies this Memorandum

Opinion.


Dated: August 20, 2008


                                    _____s/ Garrett E. Brown Jr._____
                                    GARRETT E. BROWN, JR., U.S.D.J.

26